Good morning, ladies and gentlemen. Welcome back. As everyone knows, we have one case this morning on remand from the Supreme Court, and it's a question that we've asked you to address in briefs, and you have, and we will limit you this morning in oral argument to the relevance of Mayo v. Prometheus to the claims in the patents before us. We've expanded the argument. Mr. Kostanius will have 20 minutes representing Myriad, and Mr. Madison has the United States as a weakness. So please proceed, Mr. Kostanius. MR. KOSTANIUS Thank you, Your Honor, and may it please the Court. In its earlier decision in this case, the Court concluded that Myriad's composition claims were patent eligible because they reflected non-naturally occurring human-made inventions. They were products of human ingenuity. That's the line that's drawn by Diamond v. Chakrabarty, and nothing in the Supreme Court's case, the Mayo decision, changes that line. The plaintiffs, and to some extent the government, instead focus their attention not on that line, but on a test that they call preemption. Mayo certainly discussed preemption in Section 2B.3 of that opinion, but preemption, as the Court said in that case, is a proxy for whether or not there has been an invention. It is not a separate or additional test. And in fact, as we'll discuss here today, an evaluation of the preemptive scope, such as it is of Myriad's composition patent claims, will confirm that this is not the patenting of a natural product or something so close to a natural product that it can't be eligible for a patent. MR. MADISON Well, we're talking about a law of nature, which was dealt with in Mayo, and here we're talking about an isolated material that comes approximately from nature. Isn't it just a small move? MR. LARSEN It's not a small move at all, and I think, Judge Lurie, I'd point you to the declarations in this record from Dr. Shattuck, Dr. Skolnick, and with regard to the BRCA2 molecule, Dr. Tev Tigian explains the enormous amount of human judgment that had to be used to determine simply where to start the isolated BRCA1 DNA and where to stop it. That is, Judge Bryson, to use an analogy that cropped up in your dissent, when last we were together we talked a lot about baseball bats. MR. BRYSON I'll bet it didn't crop up. I'll put it more directly, intentionally. MR. LARSEN With regard to baseball bats, Judge Bryson, you used the analogy to contrast it to this case, that in the case of a baseball bat, man decides which parts to use and which parts to throw away. And that's really what happens here as well. The myriad of scientists, the inventors here, decided to start the BRCA1 molecule. In fact, there's much debate to this day as to what even the definition of a gene is. MR. BRYSON But Mr. Ksenia, since you've presented me with my hypothetical, let me turn it back to you. MR. KSENIA Please. MR. BRYSON That was a case in which, as I recall, the hypothetical or the example, I said, well, a baseball bat can be made from the trunk of a tree. And you could say, well, it's just basically a tree that's been chipped away, just as the David is merely a piece of marble that some unnecessary parts have been removed from. MR. KSENIA Exactly. MR. BRYSON But it seems to me that your case is more like, and I wonder how you would respond to this, a case in which one decided that one would remove the trunk of a tree and announced that one has invented a tree trunk simply by saying, well, we're going to clip the bottom of the tree trunk in order to get it out of the ground. You haven't got an invention in that case, right? You've just clipped the bottom of the tree trunk. MR. KSENIA I don't have any problem with the tree trunk not being an invention, and I'll distinguish that. MR. BRYSON And that would be true also if you, let's say, instead of cutting the tree with an ax, you used, let's say, a laser process for cutting the tree that made chemical changes on the bottom of the trunk, right? MR. KSENIA Sure. MR. BRYSON You'd still have no invention. You'd still just have a tree trunk. You're using a new way to come up with the same old thing in that circumstance.  MR. BRYSON And that's where I think, again, I'll point you back to those three declarations that I just mentioned in response to Judge Lurie. But remember, Judge Bryson, that the start point and the end point of a gene doesn't even exist until an inventor decides where it is. And if you, you discussed in your opinion figure 10A, in the, or figure 10, which is the number of pages, which is the genomic DNA as described. I'm using the 282 patent, at least in my mind, to discuss this. And if you look at the distinction between isolated DNA on the one hand, which is our claims, and the, what the patent also defines at, excuse me, column, I'll come up with it, I'll give you specific citations here. If you look at column 9, let's see, I'm going to give you the specific citations here with regard to the 282 patent. And this is with regard to the definition in column 19 of the BRCAV1 locus, BRCAV1 gene, BRCAV1 nucleic acids, or BRCAV1 polynucleotide. Those are said to each refer to polynucleotides, all of which were in the BRCAV1 region that are likely to be expressed in normal tissue. And it goes on to say at the end of that paragraph, the BRCAV1 locus is intended to include coding sequences, intervening sequences, and regulatory elements controlling transcription and or translation. Now, if you turn the page to column 24, it explains what regulatory sequences are. And those are sequences that are normally within 100 kilobases, and this is column 24, line 9, I'm starting at, sequences normally within 100 kilobases of the coding region of a locus. So, in defining the BRCAV1, the isolated BRCAV1 molecules, these inventors decided, if you now look at figure 10a, which is where the sequences start in the 282 patent, the BRCAV1 gene actually starts roughly in the line that starts at 1501 on that case, the isolated BRCAV1 gene. The decision to exclude the regulatory sequences is talking about 100 kilobases, that's 100,000 of these units before figure 10a. These scientists, and again, if you go back to Skolnick, Shaddix, and Teptidian, who explain the process that was gone through, these scientists had to make the decision of where to start the molecule and where to stop the molecule. That is, with respect, analogous to your baseball bat. In other words, that's a product of human ingenuity as opposed to just cutting off the bottom of the tree. Exactly, exactly. That is exactly our point here. Mr. Stannis, I want to ask you about Claim 20. Sure. Which is obviously the closest in terms of relevance to Mayo, both method claims. Claim 20 recites a method of screening, growing cells, determining the rate of growth, comparing the growth rates, and has these tail-wear-in clauses. How do you distinguish Claim 20 from the Mayo holding? Well, the answer is the way we did in our brief, and that is that unlike the claim that was at issue in Mayo, which starts with a principle, an abstract idea, and adds some common, what the holy trinity of Mayo is, well-understood, routine, and conventional. All of those steps were well-understood, routine, and conventional. What's distinct in Claim 20 here, Judge Lurie, is that you start with a new manufacturer, a host cell, and then apply known steps to that. That is patentable, as I understand the line that Mayo drew. I'd be remiss if I didn't mention with regard to Claim 20, and we've answered the question as we appreciate it, but we didn't petition the Supreme Court. You're saying that Claim 20 isn't in the case anymore. Well, it's not. Because they didn't raise it in their petition. It's more than they didn't raise it, Judge Lurie. They said in footnote 2, at page 7 of their petition, none of the method claims is the subject of this petition. Right, but that doesn't mean that when we get a grant, vacate, and remand from the Supreme Court, that our task is limited by what the petitioners chose to put in their petition. I don't see how we have anything other than the exact same case we had last time, which has been that the Supreme Court has sent it back to us. They have vacated our prior judgment. They've vacated our opinion. They've said to us, do a do-over, right? Not do a do-over subject to and limited by whatever the petitioners chose to raise before the Supreme Court. I don't understand what authority you have for that argument. I think I can elaborate on that, Judge Bryson. Well, do you have any authority for the proposition that our task is limited by what the petitioners have said in their petition? Well, OK, so first, I have two answers to that. First of all, the authority is that it was the petition that was granted. That's the G in GBR. It was this petition. And there was the judgment that was vacated. It was our judgment. And if this case had gone to the merits of the Supreme Court, if this case had gone to the merits and the court had decided the question that was presented to it in the petition, it would not have decided the Claim 20 issue. Fair enough. And it might have vacated the judgment in remanding. But once again, the judgment has been vacated. I don't see why we are in any different position now from the position we were in last year when we had this case in the first instance. And if you have authority to suggest that our task is more restricted than that, I'd like to hear it. Because I didn't see it in your brief. Well, I think that there is no case. And we've certainly looked. It says specifically that this is the way this has happened. But when you have in the petition, Judge Bryson, an affirmative statement saying we are not talking about these claims in this petition, in the same way that our failure to cross petition should bar us now from raising the other method claims, we're not arguing about those method claims. And we certainly could have under that analysis said, well, gee, the judgment was vacated. We should get a benefit from that. I've used up probably more of your time. That's all right, Judge Bryson. But the last point is that we don't have any reason to shrink from having Claim 20 adjudicated here for the reasons that I've answered. While we're on to Claim 20, help me with something that's just a purely mechanical, factual type question with respect to Claim 20. I'll try. Because I'm confused by the language, actually, of the claim. If you go down to what is the third line of the claim, if you have it there. I've got it typed up here. I'll read from, growing a transformed eukaryotic host cell containing an altered BRCA1 gene. So far, I'm fine. But then the, to me, odd language, causing cancer in the presence of a compound suspected of being a cancer therapeutic. What do the words causing cancer mean in that context? Are you saying that the eukaryotic host cell is itself cancerous? I don't think that's the import of Claim 20. What then is the mechanism, if it's not itself cancerous, what is the mechanism by which this method actually works, if the cell itself is not cancerous? The therapeutic. As I'm reading it with you, and I'm puzzling it with you, as I'm reading it with you, it seems to say that it's a transformed eukaryotic host cell containing an altered BRCA1 gene causing cancer in the presence of a compound suspected of being a cancer therapeutic. But the words causing cancer just aren't floating there, as far as I can see. And I suppose, if I can take one other look here at the actual... Maybe you want to come back and answer that? That would probably be a more useful use of my time. Can I just ask one question about Claim 20? Yes, Judge Moore. If we were to hold that the BRCA1 gene itself was an unpatentable subject matter, not directed to patentable subject matter, Claim 20, my understanding of your argument would be, would nonetheless be patentable because it is not just to BRCA gene. It is to a non-natural transformed eukaryotic host cell that is created. Right. This is, as I said, when last we were together, that is, there is transformation that is explicitly required by the claim. And certainly that... Okay, but transformation is somewhat irrelevant at this point. So is it something found in nature or not? No, it is not. Thank you. At this point, unless the Court has further questions, I'm into my rebuttal time. But I'll cede the podium. We will save it for you. Thank you. Mr. Hanson, representing AMP et al. Good morning, Your Honors. I'd like to start precisely where Myriad started, and that is drawing your attention to the precise language of the claims and the precise language of the specifications. Only I'm going to reach, I think, the opposite conclusion, which is the stunning breadth of the claims here, which in our view is directly relevant to the preemptive nature of these particular claims. But breadth is a 112 issue, isn't it? No, I think... Rather than a 101 issue. I think it is a 112 issue. But I think if the question is, are these claims preemptive, then the fact that they cover every conceivable form of DNA means that they are vastly more preemptive than a much more narrow example. So, for example, the specifications say that DNA, as used in the claims, includes genomic DNA, cDNA, synthetic DNA, RNA, methylated DNA, non-methylated DNA... And MAO. Yes. MAO... We decided MAO based on the administering and determining steps. Right. And the other two were sort of like mental steps, where in clauses reciting results. Here we have a claim premised on a novel eukaryotic host cell. With respect to Claim 20, I think we're different. I was talking about the composition claims, the DNA itself. And the DNA itself not only covers what I just described, it also covers all possible variations of DNA. That is, the sequences listed in the patents are not what are patented. Those are illustrative sequences and they cover all possible variations. But MAO dealt with method claims. MAO dealt with method claims. And you want to talk about composition claims. That's right, because... Isn't the holding with respect to method claims irrelevant to the composition claims? I think not, Your Honor. And I think the reason is because the law of nature, product of nature doctrine, is designed to be sure that natural things and natural laws are available to all of mankind, are available to sciences. That's true whether we're talking about a composition that is preempting all scientific use or whether we're talking about a method that is preempting all scientific use. But it's also, your point undermines your whole preemption point. Because it's also true whether we're talking about something that will broadly exclude future innovation or something that will narrowly exclude future innovation. I think Prometheus versus MAO has made it clear that breadth is irrelevant for 101 too. They say, in any event, our cases have not distinguished among different laws of nature according to whether or not the principles they embody are sufficiently narrow. And this is understandable because courts and judges are not institutionally well-suited to make these kinds of judgments. So I don't see any relevance to your entire point about this is going to broadly preempt because it's a broader claim. They've said if it's a law of nature, quote, bright-line prohibition, end of story. So your preemption argument seems to be a waste of time and space. Well, then maybe I should move on to something else. But let me make one more. But let me make just one other point on the preemption, which is that the claims not only cover what I've just described, but also cover all fragments. So it's not just claims five and six that cover fragments. It's all of the claims. But to move off the point given Judge Moore's expressed views, I think the other subject I wanted to address is claim 20, which I ducked when you first asked me about it. I'm now prepared to go back to it. First of all, in answer to the exchange you had, Judge Bryson, Lockheed Martin v. Space Symptoms, a decision of this court, says specifically that the law is as you described it. That is, claim 20 is before you. The case is before you as if you had never issued a decision. Now, with respect to claim 20, the transformed eukaryotic cell is not something that Myriad transforms. They buy it off the shelf. In that sense, it's really no different than a test tube. It's really no different than putting an altered BRA gene in a test tube. Are you suggesting someone else invented it? I'm suggesting someone else invented it and transformed it. This is something they just call up a lab and say, send us a transformed eukaryotic cell that will allow us to put the BRCA gene into it. In what respect has it been transformed prior to the insertion of the altered BRCA1 gene? Neither the patent nor the specification explain the answer to that question. As near as we can hypothesize what has been transformed is the cell has been made in a condition where it will accept the BRCA altered gene that they're putting into it. That's our best guess as to what they mean. What is your best understanding of what the words causing cancer are doing in that claim? Again, it's not defined in the specifications. Our assumption is that that means that the altered BRCA1 gene that is being put into the transformed cell is one that has a correlation with an increased risk of breast or ovarian cancer. That is not just any BRCA altered gene. It is one that has been shown to have the effect of increasing the risk of cancer. That's my best guess as to what that language means. Mayo dealt with, as I mentioned earlier, administering and determining. That's right. Plus these perhaps middle steps. Here we have something more. The Supreme Court said what you need is something significantly more. Isn't this significantly more? No, quite to the contrary. First of all, this is just putting the BRCA gene into the cell. Using it. No, not using it. Seeing what happens, which is precisely what Mayo was about. All that you do with this claim is just put the stuff all together in the cell and see what happens. Unlike Mayo, Mayo for example, we specified what compound we were putting into the body. Here it's any compound. Salt, sugar, water, oil. It doesn't matter. Every compound in the world you could possibly put in is covered. In Mayo, we talked about the claims involved precise numbers. Measuring how much of the measurement you were making mattered. Here there's nothing that matters. It all says just check the various growths between the two things. We don't have a measurement of how much growth makes a difference. Mr. Hansen, isn't it true that the eukaryotic host cell is not something found in nature? It's not found in nature. How is this different than Chakrabarti's bacteria? It's something not found in nature and you've modified it. They could patent a transformed eukaryotic cell. That's not what they've done. That patent apparently is held by someone else because they just buy it from a lab. What they've patented is using this thing that someone else has patented and just simply using it to see whether they can cure cancer. What they've patented is using a thing not found in nature to see if it has therapeutic properties to fight cancer. How does this not take us totally outside the umbrella of the 101 problem because this isn't something found in nature? This is something man-made. That's the starting point. If we administer a drug to the body and the drug is something that doesn't occur in nature, it's a drug that is man-made, I think under Mayo we would clearly find that that would be unpatentable subject matter. You mean the method? Yes, I mean the method. Assuming the drug is already not the subject of the dispute over patentability. A method of using aspirin in a person, assuming aspirin doesn't appear in nature, it seems to me under Mayo would be clearly unpatentable subject matter. The original penicillin, Pen-G, was a natural product. Would a claim to using penicillin to treat antibacterial infections have been patent-eligible subject matter? Well, I don't know enough about the degree to which the penicillin is transformed between the stage where it is mulled and the stage where it's used as a therapeutic and that might make a difference. But the rule has to be that it doesn't really matter whether penicillin is, in terms of method claims, it doesn't matter whether penicillin is man-made or not, administering the penicillin and looking to see what happens under Mayo is not patentable. The penicillin as a composition may or may not be patentable depending upon whether it is markedly different from what appears in nature, but penicillin as a method is clearly not patentable. Clearly not patentable. Well, clearly they didn't patent it. There was a big hiatus between Fleming and Chain and the other people who applied it. So you're saying that invention of that magnitude, if they had recognized its antibacterial activity earlier and filed on it, that method would not have been patentable, although obviously it was operating using a law of nature because the penicillin inhibited the growth of the bacteria, penetrated the cell wall, whatever it did. But that wouldn't have been patentable in your view. As your honor well knows, a patent isn't a reward for effort or magnitude. E equals MC squared took an awful lot of effort and was very… I did not understand that to be your position. What I understood your position to be is that regardless of whether penicillin was patent eligible or had been patented or what, but if penicillin was out there and all you did is you took penicillin and you put it next to some bacterium and you tested it against water and it worked better than the water, if that's your invention, that's not patentable. Precisely. That is correct. That's what you see. If I went beyond that, yours is exactly what I intended to say. If I went beyond that, I misplaced it. Thank you, Mr. Henderson. Do you have one final thought? No, thank you, your honor. Okay, we'll hear from Ms. Patterson. May it please the court, Melissa Patterson for the United States. In our view, Mayo provides another tool for determining whether the isolated but otherwise unmodified DNA at issue here falls within the patent eligible human invention category or if it falls into the product of nature exception. So is Mayo a tool like the magic microscope is a tool? Has the government abandoned that argument? I'm wondering when I draft an opinion if it's something we need to address. Your honor, we still think that's a useful metaphor for how we break down the world. Really? Just in terms of illustrating the differences between cDNA and isolated but otherwise unmodified. But we understand that the court didn't consider it helpful at getting at whether or not the changes due to isolation are enough. Are they markedly different? The court continues to maintain that they think a magic microscope test might be an appropriate test to make the call whether something is patent eligible or not. Let's not call it a test, your honor. I think that as a metaphor it still helps us think about the differences between cDNA and isolated DNA here. But let's focus in on what this court focused in its first opinion and how Mayo relates back to that. And that's whether or not the changes made by isolation are enough to render the isolated DNA here a human invention. And I know that there's been talk that, you know, Mayo, yes, it's about process claims and these are what the United States is talking about is product claims. But remember, as Mr. Hansen said, these all come from the same exception. The stuff that's supposed to be free to all mankind is not only a law of nature but also products of nature, plants found in the wild, minerals found in the earth. That's what's supposed to remain free to all. And Myriad has offered no reason, nor could we think of any, why the court would be so concerned about preempting a law of nature that it would mention it repeatedly. I think it was five, six, seven times. But they would be totally unconcerned about the public access to a product of nature. Now the law of nature here would be taking a DNA, would be a process of taking a DNA and converting it to the RNA and then translating it to a protein. That would be a law of nature. But how is a material which is different from what is found in nature a law of nature? Your Honor, we have not made the argument that these product claims preclude a law of nature. But that's what Mayo is all about. Mayo was about… We're talking about the relevance of Mayo to all of these claims. That's right. But as I said, we think that the problem here is that these claims, some of these claims preclude public access to a product of nature. And for the same reasons that it was so problematic, as the court found, to preclude the public's ability to use and exploit in different ways a law of nature, those same concerns are relevant to whether or not patents prohibit the public or inhibit its ability to use and exploit in new and different ways a product of nature. And everybody agrees that the native DNA, the DNA in all of our bodies is a product of nature. So we think the relevant question here is, can the public still get at it? Can the public still use and exploit that in new and different ways? And I think this was a concern very much present in Judge Bryson's first opinion in this case. And we think the Supreme Court's opinion in Mayo suggests that that's the right way to approach the question here. You all are in the very unusual position of arguing a case where you know a lot about what our views are. And hopefully you know where we stand too, Your Honor. Since you've raised where we stand. Or at least stood. Hopefully you still know where we stand here. Now, I don't recall whether we actually asked this question last time or not, but I'll ask it again if it's a repeated question. But your views are the views of the United States. Does this represent the views of the Department of Commerce and in particular the PTO? Or is this the views of some group of entities other than the PTO? This is the views of the United States as authorized by 28 U.S.C. 516 and 517. I don't think I could get into the views of any particular agency without going into internal governmental deliberations, which I'm really not at liberty to do. I'm familiar with events that have occurred in past cases in which different agencies have taken different positions. And, in fact, I remember the case of TVA against Hill in which Attorney General Bell authorized the TVA to file a dissenting brief as an appendix to the government's brief. So there certainly are instances in which agencies take different positions. This is the position you say is of the executive branch of the United States, period, end of discussion? That is who I am here representing, and this is the position authorized by the Solicitor General. Okay, and so, well, all right, I'll leave it at that. We note in our first brief that this is a rather unusual case for that reason. And as the Solicitor General acknowledged in the first oral argument in this case, we don't think that this is a close case in a sense. We could not find a principled line that would let the isolated DNA molecules at issue here be patent eligible but would not leave things like the tungsten in the old General Electric case or things like an isolated electron, no matter how hard it was to isolate, or if you could break apart a proton, a bond even more fundamental than a covalent bond, if you could isolate a quark, can you patent that? The Higgs boson is not patent eligible. Under our view, it assuredly is not, Your Honor. And I think that this idea that there's this huge wall between the ways that we think about the law of nature exception and the product nature of exception is simply not borne out by the repeated concerns of the Supreme Court. And we think in general, as a general rule, because of course that's what we're creating here, we're not creating a DNA-specific rule, as a general rule, when the only changes that someone has made to a product are those incidental to its extraction from its natural environment, that you're almost always going to have a big preemption concern because as a general matter, in order to engage in any serious study or any serious exploitation of a product of nature, you need to remove it from its natural environment. Coal doesn't do much for anybody when it's in a vein, in a lot of rock under the ground. You need to extract it before you can start exploiting its natural properties. And so that's why we think that some of the early isolation cases, like the tungsten case, and the isolated DN here are so problematic. Because Myriad does not point to a single way in which another researcher could take out and use the gene at issue here, or any fragment thereof, that's at least 15 base pairs. At page 16 and 17 of their supplemental brief, they say, well, there are 20,000 other human genes. And they say, well, you could look at antibodies to suss out a hereditary disposition. How should we take into account the settled property rights and expectations of the biotech community and the world at large? The PTO clearly announced these things to be patentable for decades. And thousands of patents exist on this. And industry has been built up on it. And there's a lot of money at stake here. If it was so obvious these things are unpatentable, how come no one brought it up in 30-plus years this has been going on? It is remarkable that this case didn't come before the court. I think Judge Dyke flagged that in the Intervet decision, that no court has addressed this until now. But I point the court to the Bilski decision of the Supreme Court, which, of course, there were thousands of patents that were invalidated by the court's opinion there under its 101 analysis. But nowhere in its statutory analysis did the court suggest that that was a reason to alter the way that it looked at Section 101. And similarly, at the end of the Mayo opinion, the court was very careful to say, look, the parties, the amici, they disagree about the incentive effects for the diagnostic testing market. But we're not here to create rules about a specific field. We need to make general rules. We need to make general principles about Section 101. And that's what we're asking the court to do here. We're not saying that the policy incentives one way or the other should swing it. We think under general principles, principles reinforced by Mayo, that these types of claims, where the only changes made to the natural product are those incidental to extraction, those types of claims too broadly preempt the public's access and ability to study, to sequence, to do new things with DNA as it's found in the human body. What about the primers and probes? Your whole argument thus far has focused on the whole team. What about the primers and probes? Well, I think that the way that the claims are structured would prevent anybody's ability for making a new type of primer or a new type of probe. And moreover, those primers and probes that the court suggested might be part of the additional utility, which is also part of the analysis here, I want to note that they depend on the inherent properties of these isolated molecules. They're base pair complementarity. And I think that's quite different than what the court pointed to in Shocker-Barty. No bacteria had ever been capable of breaking down all four components of crude oil. So the utility they pointed to... But no 13-sequence section of DNA in the human body is capable of acting as a primer or a probe only when extracted and made into something different than is what is found in the human body because in the human body you can't get those effects. I mean, do you think all that Supreme Court case law about distinct and markedly different utility is defunct now? Not at all, Your Honor. But I do think it may mean something slightly different. So there are lots of things that you can do with coal when it's extracted that you can't do when it's in the ground. All of a sudden you can use it to combust. In the same way, when you clip out that 13 base pair segment, you can do new things with it. I don't think anyone would disagree with that. But the question we think is, did you give it that ability? And I think the relevant quality there is its base pair complementarity. And that's different than the sort of utility, the marked difference that the Supreme Court pointed to in Shocker-Barty. Didn't you give it that utility by selecting the exact nucleotides that would function that way? Because you can't just grab any 13 in the human body, right? You have to grab a certain 13, for example, to make it work. I don't think that's right. And looking back at the uranium case from the CCPA, you uncovered the utility, the ductility of tungsten or uranium or vanadium by isolating it out of its naturally occurring compound. But that doesn't mean that the inventor bestowed that quality upon it. He may have discovered it. There may have been lots of discovery happening in this case, but those aren't the types of discovery I think the court was talking about in Shocker-Barty, in Funk Brothers. I see I'm over my time. If there are no further questions, let's go. Thank you, Ms. Patterson. Mr. Stanius has six minutes of rebuttal, and if we run over a little bit, that's fine. Thank you, Your Honor. We start with Claim 20. Judge Bryson, to your question before, the language is host cell containing an altered bracket 1 gene causing cancer. It is the gene causing cancer that's inserted into the host cell. It's a little bit of an obtuse way of wording. Well, all right. I don't want to hold you up on this. That's all right. I think I'll be able to conclude within my six minutes. At least I hope I will be able to. Also, with regard to Claim 20, it's worth remembering that in Mayo, the court took pains to point out that the use of a drug, even an old drug in a new way, can be patent eligible as a method. That's really not far afield from taking this new substance, which includes a bracket 1 gene. And I must tell you, I don't know where in the record it is that we somehow or another get the bracket 1 gene off the shelf, because that's certainly not the case. In fact, the insertion of the bracket 1 gene is very much like Chakrabarty, where the plasmids were inserted into the chromosome. Finally, it's important, with regard to the method claim, that Mayo was concerned with tying up an old activity that was commonly used by doctors by simply appending some additional common, ordinary, routine, obvious, used-in-one-point-of-the-opinion method steps. Turning to composition claims, the United States says there's no principled line that they can draw. They don't have to draw the line.  It is the line between human-made inventions and things that are not human-made. I've already been through, in my opening argument, how these molecules represent the inventive selection of start and stop points. We're not just relying on some sort of sweat-of-the-brow analysis that it took a lot of work to get there. This is work and inventive judgment that defines the molecule. Bracket 1 was being used as a term, but it has never been defined. It doesn't even make sense to me. Inventive judgment. It's inventive judgment to figure out which parts are coal and which parts are rock, too. But it's still just extracting coal from the ground, and coal is something found in nature. I guess I disagree that that's inventive judgment in the sense that you're saying it's just extracting. That just extracting is not inventive judgment. So you believe that coal extracted from the ground is patentable subject matter? No, I don't believe that, and I don't believe that we have to reach that in this case at all. This is different, because the inventors picked the start and stop points and conferred by picking those new structures, Judge Lurie's opinion, that have new functions and new utilities, as you yourself, Judge Moore, pointed out in your prior paper. What new utility does the whole gene have? Primers and probes, I agree with you on, but what new utility does the whole gene have? The long strands that you were concerned about can be used, for example, as protein replacement therapy outside the body. That's not something that can be done with the gene inside the body. I will add that the issue of utility was never litigated because the plaintiffs conceded that, and that's at, I believe, page A193 of Judge Sweet's decision. But protein replacement therapy is just making more of the protein, and that's what the gene does in the human body already. It makes protein, right? I don't mean to pin the pot at home. No, I don't mean to, but if you have a gene that is not working in your body, then you can use the longer strand for protein replacement therapy outside the body. And if it's unisolated and connected with other genes, it probably produces other proteins, doesn't it? Right. Different proteins. Maybe sometimes the wrong protein, the one that might result in cancer. I don't even know what to say with regard to the magic microscope test except to say what I said last April, and that is that the magic microscope, I hope, is an invention because it's a really useful, new tool that allows you to look inside the body. And it's not obvious. Well, by now it's obvious. In fact, I would have thought it was obvious that it was out of this case, but it's come back, so I'm going to address it. But the important point, Judge Lurie, is that the magic microscope that's posited by the United States government is what our molecules allow doctors to do. They allow us to go look inside the body and see abnormalities. That's what those probes and primers do. So you think that the full gene is directed to patentable subject matter because there's human ingenuity involved in deciding where to clip it? Yes. It's true with the tree trunk and everything else. Somebody's got to decide where to make the cut. Well, a decision is different than invention, and I think we pointed out as long ago as the Robinson tree is from 1890. Invention is different than just making a decision. That's why we have the skilled artisan concept in patent law. It's more than what a skilled artisan would do. It's invention. The point about preemption with regard to the... Let me make sure I understand this point. Following up on Judge Moore's question, I mean, suppose we go back to an example that I think was used last year, the kidney extraction example. Are you saying that if I understand where you have to cut the kidney in a healthy donor in order to maximize the chance of that kidney being effective in a transplant operation, that I have a right to claim the kidney as an invention? That I invented the isolated kidney because I learned where to cut the portions of the kidney and take it out of the body of the original donor? I don't think so. I think this is not just a difference in degree. I'm not sure why it's different from the case you just put in response to Judge Moore. Because I think that you have much more involvement with regard to where the decision to start and stop is. Well, you know what you're saying? It's a complicated question than just deciding to cut here and there. But suppose that's a really complicated question. And for years, people have been messing up kidney transplants by not cutting in the right place. And setting aside process claims, you're claiming that I think that as long as that's a complex question that is a difficult problem to solve and somebody solves it, that they get to claim the kidney, right? No, I don't think so at all. Why not? Well, because I think every kidney is unique. Isn't it also true that the kidney is an organ? Right. Whereas what we've got here is a chemical well-defined composition. That is correct, Judge Lurie. Let me just conclude with a couple of very quick points. This notion that you have to remove or isolate a molecule in order to analyze it has come out of the government's brief and the government's argument here. That's simply not the case. It's not supported by the scientific authorities they cite. And I think more fundamentally, Dr. Watson, one of the co-discoverers of the double helix, had his entire genome sequenced using whole genome sequencing, which because it doesn't use isolated BRCA1 DNA doesn't fall within our patents. And interestingly enough, he was found to harbor a mutation on the BRCA1 gene. Judge Moore, your questions about settled property rights, investment decisions, and the rule of law is very telling to us. I think it's worth remembering the I4I decision. You think that it's directed at patentable subject matter because it's man-made, it's man-made because you decided where to make the cut. This is your whole case. Just spend more time on it, please. I will be happy to. Because it's not just deciding where to make the cut. Again, I've referred you to the Skolnick, the Shaddix, and the Taptigian declarations, which describe in detail what level of human invention was involved. Not just human judgment, not just human involvement, but actual invention that was required to decide where to make the cut, to use your term. And does that get me to obviousness as opposed to eligibility? It begins to sound an awful lot like obviousness. And I have to acknowledge that the court in Mayo at one point used the term obvious with regard to adding the steps. But here I think we're asking the threshold question. This is a declaratory judgment action. The declaratory judgment was brought only under 101. We have never counterclaimed, so there's never been an opportunity to litigate those other sections of the patent code. The conclusion is, simply put, Chakrabarty drew the line. This court applied the line in Chakrabarty. Nothing in Mayo changed that line. Unless the court has further questions for me. Thank you, Mr. Stainless. Other counsel will take the case under advisement. It remains to be seen whether we'll be back. All rise.